OPINION OF THE COURT
Arthur D. Spatt, J.
BACKGROUND
This is an action wherein plaintiff Michael E. Durham seeks a declaratory judgment determining that he has exclusive ownership and right of use of a 100-foot bulkhead and walkway located at the westerly edge of his residence, 2 Cedar Lane, Massapequa, New York. Said bulkhead and walkway abut the navigable waters of the Massapequa Creek.
The defendants are neighbors of plaintiff, who reside at 4, 6 and 8 Cedar Lane. These parcels are landlocked prop *192 erty and defendants claim that they have a right, equal to plaintiff’s, to use the bulkhead and walkways for all those purposes commonly known to be “riparian” in nature. In support of their claimed right of use, defendants, in their answer, set forth two theories. First, that they have a “prescriptive easement”, as to the bulkhead and walkway, including access thereto over plaintiff’s property. Secondly, they contended that such right of use and access emanates from an express grant (reservation) contained in the wording of the deeds in both plaintiff’s and defendants’ claim of title. This wording, they assert, viewed in light of surrounding circumstances and events, manifests the intent of the common grantee, Pia Kreissle, that all parties were to share in the use of the waterfront.
This matter came before me as a jury trial. Prior to commencement of . trial, the parties stipulated that the issue as to the existence of a “prescriptive easement” would be decided by the jury, and that the interpretation to be accorded the pertinent portions of the relevant deeds (agreed to be Exhibits D, E, F, and H), that is, the determination as to whether there is an easement by grant”, would be left to the court.
After hearing the testimony and at the close of defendants’ case, the court directed a verdict dismissing that portion of defendants’ case as relied upon a “prescriptive easement”. The court found that “There is no evidence in this case sufficient to go to the jury, that the use of the land by the defendants was anything other than by permission. Such use cannot ripen into an ‘easement by prescription’ ”. Further, the court found that “the use of the waterfront by defendants was with the plaintiff’s predecessor’s knowledge, consent and permission”.
At the close of the trial, the court reserved decision as to the “easement by grant”. The parties agreed that the court may use the trial testimony in determining this issue.
Do the defendants, owners of 4, 6 and 8 Cedar Lane, have an “easement by grant” entitling them to access to and use for riparian purposes of the bulkhead and walkway situate on plaintiff’s property? Upon the facts and law set forth below, the court answers this question in the affirmative.
*193 FINDINGS OF FACT
(A) THE DOCUMENTS
The court, in finding the facts in this case, has drawn upon those documents (deeds) submitted by counsel, and upon the testimony at trial.
By a deed dated December 30, 1941, Pia Kreissle, the “common grantor”, acquired six contiguous parcels of land, then denominated “Lots 58 to 63”, which lots, were each approximately 120 feet long and between 30 and 40 feet wide. Each lot was bounded on its westerly edge by the navigable waters of Massapequa Creek, on the east by Alhambra Road and on the north by Lot 57. By a purchase soon after the first, Kreissle obtained ownership of Lot 57 and property further north. The westerly end of Lot 57 also abutted the Massapequa Creek.
Sometime after her purchase and prior to 1946, Pia Kreissle improved Lots 58 to 63 by erecting thereon initially for rental purposes, two distinct semidetached houses (four residences in all), with each residence facing northward toward Lot 57. This Lot 57, now known as Cedar Lane, provides each house with access to Alhambra Road.
As a result of this improvement, Lots 58-63 were segmented widthwise into four nearly equal parts, with a residence on each segment. The house on the westernmost segment, now known as 2 Cedar Lane, is the only house left abutting or having direct access to the Massapequa Creek. As to the remaining segments, 4, 6 and 8 (Cedar Lane), 4 being the next most westernly residence; are all cut off from the water.
By a deed dated March 30,1946, Pia Kreissle transferred her interest in 6 and 8 Cedar Lane the easternmost residences to Ralph Hitchcock and Walter Posten (Exhibit D). Said deed contains the following language, which, in fact, is at the heart of the dispute herein.
“Together with all riparian rights except the right of way and reasonable use of the same by occupants of the adjacent house on Cedar Lane provided he shall bear his proportionate share of any public assessments made for the improvement thereof”. (Emphasis supplied.)
*194 “Together with an easement over that portion of Lot 57 Fifty Seven being the northernly ten feet (10) feet [sic] designated as a driveway and leading to the water way or lagoon designated on the map as Creek”.
At the time of the execution of said deed, and until 1961, in which year Kreissle transferred to the owners of 2, 4, 6 and 8 Cedar Lane a quitclaim deed to Lot 57 (Cedar Lane), Lot 57 remained Kreissle’s property.
By a deed dated June 20,1946, Kreissle transferred 2 and 4 Cedar Lane to Robert and Janet Brown, plaintiff’s predecessor in interest. The pertinent portion of this deed (Exhibit E) provides as follows: “The party of the first part [Kreissle] reserves a right of way over Lot 57 for herself and for owners on the south and north * * * Subject to * * * reasonable riparian rights of owners of the easterly portion of the Lots conveyed”.
Between the words “Subject to” and “reasonable riparian rights”, above noted, the words “right of way to the water front and”, initially in the deed, were scratched out at the time of signing.
Both Hitchcock and Posten on the one hand, and the Browns on the other, had in fact purchased two residences each. Soon after their purchases, they each sold one of their two residences. By a deed dated March 24, 1947, Hitchcock and Posten sold 6 Cedar Lane to John and Eleanor Bennett. Said deed provided, in part, as follows: “Together with all riparian rights except the right of way and reasonable use of same by occupants of the adjacent house on Cedar Lane provided they shall bear their proportionate share of any public assessment made for the improvement thereof”. (Emphasis supplied.)
By a deed dated August 25, 1948, the Browns sold the residence at 4 Cedar Lane to Robert and Jean Pollock. (Exhibit H.) Said deed provided, in pertinent part, as follows:
“together with a right of way over the whole of Lot 57 as shown on the above mentioned map easterly to Alhambra Road; reserving, however, to the parties of the first part and their successor in title of the premises adjoining those above *195 described on the west a right of way over the whole of Lot 57 as shown on the above mentioned map easterly to Alhambra Road; and subject to a right of way over the whole of said Lot 57 in favor of Pia Kreissle and owners of premises adjoining said Lot 57 on the south and on the north.
“together further with reasonable riparian rights, and subject to such rights of the parties of the first part and the owners of the easterly portion of the above mentioned lots previously conveyed.” (Emphasis supplied.)
Between 1948 and the present, ownership of 4, 6 and 8 Cedar Lane has passed through various hands. However, with the exception of two deeds in the chain of title to 8 Cedar Lane, and an initial deed given defendant Ingrassia to 4 Cedar Lane, which deed was subsequently corrected, all the deeds given as to all parcels made reference, with certain variations in wording, to “riparian rights”. For instance, as to 4 Cedar Lane, the deed dated April 11, 1964 from Pollock to Uhlan, defendant Ingrassia’s immediate predecessor in interest, provided as follows:
“Together with any and all easements and riparian rights of the party of the first party [Pollock] in and over the westerly part of Lots 58 through 63 and the creek west of said Lots.
“Together with an easement over the northerly ten feet of Lot 58 from Alhambra Road on the east to the creek on the west.”
This court need not and shall not review the wording of each and every deed. For, as counsel noted at oral argument, the “easement by grant”, if it in fact exists, can be no more nor less than that accorded by the words contained in four deeds (Exhibits D, E, F, H); that is, the deed from Kreissle to Posten and Hitchcock; the deed to Brown; Brown to Pollock and Posten and Hitchcock to Bennett.
(b) conduct as to the waterfront
r Eleanor Bennett testified that she resided at 6 Cedar Lane from 1947 to 1974. She testified that she was present in 1947 when title to her house was closed. She stated that she read the deed at the time; and discussed with her attorney the *196 meaning of the words “riparian rights” contained therein. She indicated that she understood the terms to mean that Kreissle had divided the land into four parcels and that each owner could use the area along the shore in a “community situation”. Her attorney at the time indicated, that, given this interpretation, the deed was “poorly worded but if this is what it meant, we will accept it.”
Mrs. Bennett testified that when she moved in, the bank of the river formed the western edge of 2 Cedar Lane. There was no bulkhead at that time. However, there was already present a split-rail fence, which ran along the entire westerly edge of 2 Cedar Lane and three feet back from the water. There apparently was a wooden walkway along the bank, to which she had access through the afore-mentioned fence. She would stroll along the bank, she recalled.
In 1950, apparently as a result of deterioration along the bank, Mr. Brown suggested that a bulkhead be erected. Brown asked her to contribute 25% of the cost of $1,200 needed to construct the bulkheading. This she did. She did so, she testified “Since it was ours, we were expected to keep it in repair”. She stated that Brown and the other residents all agreed that they were to share the waterfront.
Mrs. Bennett noted that although Brown extended the length of the bulkhead an additional 40 feet between 1952 and 1958, part of which extension covered the waterfront along Lot 57, which lot was not part of Brown’s property, she did not contribute to such additional bulkheading.
Mrs. Bennett testified, that, over the years, she had access to the bulkhead by walking down Cedar Lane (Lot 57) and then through the fence on Brown’s property. She never asked Brown’s permission to gain access. She would walk along the walkway adjoining the bulkhead; and, over the years, her children would fish, crab and between 1956 and 1968 tie up boats to the bulkhead.
She testified that Brown’s children had boats tied at the bulkhead; so did the Pollacks (a rowboat); and the Postens. Posten would fish and feed ducks along the waterfront. She noted that the neighbors had no special place along the waterfront to dock their boats — they would take any avail *197 able spot. In 1961, when the Sundmans acquired 8 Cedar Lane, they also moored a boat along the bulkhead.
While Mrs. Bennett conceded that she never paid any portion of a tax assessment on the bulkhead, she noted that the tax assessment in 1947 on Lots 2, 4, 6 and 8 were all approximately equal. It is her opinion that part of her assessment arose from her equal right of access to the waterfront.
William Sundman, who has rented at 8 Cedar Lane since 1963, testified that he had used the bulkhead and adjacent walkway to walk along during the summer; to smoke a cigarette; to watch fireworks; feed ducks; to “take a quick dip”. Indeed, a friend of his kept a boat along the bulkhead. He noted that in 1974 or so, when the walkway deteriorated, he contributed new planking to cover “rotten spots”. Between 1963 and 1975 he used the bulkhead without permission being required and in harmony. In 1975, Mr. Brown, who was in the process of selling 2 Cedar Lane, objected for the first time to his use of the waterfront.
Donald Colemmo, a defendant, testified that he had resided at 6 Cedar Lane since 1969, and has, since that time, used the bulkhead to tie up his boat; to fish; to eel; to feed the birds; and to swim. He noted that he has himself, along with defendant, Salvatore Ingrassia, made repairs to the walkway.
Salvatore Ingrassia, owner of 4 Cedar Lane since 1971, testified that he too has used the bulkhead for leisure purposes, including the tying up of a boat. He, as did all the other witnesses, testified as to the close community relationship that existed prior to plaintiff’s arrival. He never asked Brown’s permission to use the bulkhead; he stated that it was understood that such use was a “community right”. He testified that he had conversations with Mr. Brown as to the use of the bulkhead; Brown indicated that the dock was shared by all the homeowners, and should be maintained by all.
John Dennis Brown, son of the prior owner of 2 Cedar Lane, emphasized that the relationship between the original owners along Cedar Lane was quite close. He saw the first boat in the water in the 1940’s, and, noted that all the resi *198 dents used the waterfront for walking, crabbing, feeding ducks, swimming and mooring boats.
Finally, plaintiff offered certain testimony relative to “tax stamps” present on the various deeds. Such proof was offered to demonstrate that 2 Cedar Lane was in fact purchased for a greater sum than 4, 6 or 8 Cedar Lane and, by inference, such greater value was as result of what was then recognized as its direct and exclusive access to the waterfront.
The court finds this testimony to be speculative. The purchase price variation could be attributable to a variety of factors, including the presence or absence of a mortgage or the size of the lot or the view. Thus, as to the central issue, that is, the meaning of the “riparian rights” terminology in the “four deeds”, this evidence as to price is little, if any assistance.
CONTENTIONS
Plaintiff, Durham, contends that the language contained in the “four deeds”, specifically reserving to defendants’ predecessors in interest, either “all riparian rights”, or “reasonable riparian rights”, was intended to, and does, afford the defendants access to the Massapequa Creek solely over Lot 57 (Cedar Lane); and, once at the river, the right to use such navigable waters. However, plaintiff steadfastly maintains that such language does not grant defendants the right of access to and use of the bulkhead and walkway concededly located wholly on his private property. He maintains that the conduct of the respective predecessors, which conduct shows a “community use” of the waterfront interest, does not dispel his argument. Such conduct, he maintains, evidences only that Brown granted the other residents a “license” to use the bulkhead, which license he now wishes to revoke. Simply put, he argues that the mere grant of “riparian rights” does not confer any right to use another’s property.
Not so, argue defendants. They contend that the words “riparian rights”, when given their natural and accepted meaning, and when considered in conjunction with the intentions of the parties to the deeds, as those intentions found *199 expression in those persons’ subsequent conduct clearly demonstrates that the deeds granted all residents of Cedar Lane an equal right to access to and use of the waterfront, which, since 1950, includes the use of the bulkhead and walkway.
THE LAW
Specific property rights arise as a result of the ownership of land along the banks of a waterway. (See Town of Hempstead v Oceanside Small Craft Marina, 64 Misc 4; 63 NY Jur [rev ed], Waters, § 259.) These “riparian rights” afford the owner thereof access to navigable waters, including the right to construct a dock. Further, such right includes the use of the water for general purposes, such as boating, fishing, domestic uses, wharfing out to navigability and access to navigable waters. (See Hinkley v State of New York, 234 NY 309, 319; Town of Islip v Powell, 78 Misc 2d 1007; Allen v Potter, 64 Misc 2d 938; 63 NY Jur [rev ed], Waters, § 259.)
Such “riparian” rights are to be distinguished from the rights of the general public (jus publicum), of which defendants herein are, of course, members, to use navigable waters (such as the Massapequa Creek) for fishing, boating and other lawful purposes, and also the “foreshore” of same. (See Tucci v Salzhauer, 40 AD2d 712, affd 33 NY2d 854.)
Clearly, when the “riparian land” abuts navigable water, the primary advantage held by the riparian owner is the right of “access”, and the right to erect structures so as to exercise that right. In this regard, it has been stated that “Normally, the right of access to navigable waters over adjacent [riparian] lands held under private ownership is vested exclusively in the owner of such lands, and can be exercised by another only by virtue of a grant or license” (63 NY Jur [rev ed], Waters, p 453; emphasis supplied).
What is an adequate “grant”? Does it exist in this case?
It has been stated that “Ordinarily, the absolute deed of a riparian owner prima facie passes all of his riparian rights in the land, in the absence of an express reservation of such rights.” (See 93 CJS, Waters, § 206; emphasis supplied.) Thus, in the absence of an express reservation of riparian rights by Kreissle, the deed from Kriessle to Brown, trans *200 ferring her interest in the “riparian land” extinguished, absent a specific reservation, any riparian rights which either she or the easterly owners might have possessed.
In this regard, it must be noted where a tract of land, said as Lots 58-63, abuts a waterway, and a portion thereof (4, 6 and 8 Cedar Lane), not contiguous to the waterway is conveyed to separate owners, such conveyance deprives the noncontiguous portions so transferred of their “riparian” status; unless a specific reservation of riparian rights is placed in the deed. (See Rancho Santa Margarita v Vail, 11 Cal 2d 501; 93 CJS, Waters, § 206.)
Do deeds D, E, F, H provide the defendant noncontiguous owners with an express reservation of the riparian right of access over the shoreline located on what is now plaintiff’s property? The answer lies in the interpretation of the deeds, and the rules of law governing such interpretation.
In construing a deed, the court must look toward “the intent of the parties, so far as such intent can be gathered from the whole instrument” (see Real Property Law, § 240, subd 3; cf. 93 CJS, Waters, § 209). “ ‘When the language of the grant [deed] is certain and unambiguous * * * it alone may be considered in determining the true intent of the parties to the grant’ ” (Senate Realty Corp. v Lattingtown Harbor Dev. Co., 198 NYS2d 882, 885).
Where, however, the language is ambiguous, or is “susceptible of more than one interpretation the courts will look at the surrounding circumstances existing when the contract [deed] was entered into, the situation of the parties and the subject-matter of the instrument.” (Wilson v Ford, 209 NY 186, 196; Passaic Val. Council Boy Scouts of Amer. v Hartwood Syndicate, 46 AD2d 247.) Given such “ambiguity”, the court may achieve its goal, that is, discovery of the true intent of the parties, that is, what is the “practical construction” which the parties themselves placed upon the instrument terms. (See Van De Carr v Schloss, 277 App Div 475, 477; 15 NY Jur [rev ed], Deeds, § 73.)
CONCLUSIONS
Although the terms “reasonable riparian rights” and “all riparian rights” set forth in the four deeds in question are *201 not free from ambiguity, this court, upon a review of the relevant portion of the deeds, and, with an eye toward the circumstances surrounding the creation of the deeds and the “practical” interpretation accorded to said terms by the parties, concludes that it was the intent of Pia Kreissle, and also the intent of Robert Brown, to specifically grant the owners of 4, 6 and 8 Cedar Lane the right to use, in all those manners defined as “riparian”, the waterfront area of 2 Cedar Lane, now improved with bulkhead and walkway.
The court notes that each of the four deeds reserves to the owners of 4, 6 and 8, in addition to “reasonable riparian rights” or “all riparian rights”, a right of way over Lot 57. Such right of way, in and of itself, afforded 4, 6 and 8 access to the waterfront. By virtue of the “navigability” of the Massapequa Creek, the defendants, given the “general” rights accorded to members of the public to navigable waters had, as a result of the right of way over Lot 57, full use of the waters of the creek.
If indeed, as plaintiff contends, the specific reservation of “riparian rights” in the deeds was just an easement granted defendants to have access over Lot 57 to the water, then, in effect, such terms would be redundant. This could not have been the intention of Mrs. Kreissle. Prior to the improvements made by her, Mrs. Kreissle had one parcel of land (Lots 58-63), with full riparian rights. After the improvements, she had one riparian parcel and three landlocked parcels. She wished to rent and later to sell all four parcels. To foster saleability, Mrs. Kriessle expressly, and intentionally used a term of art, the work “riparian”. This word carried with it a very specific meaning — access to the water over the shoreline now part of 2 Cedar Lane and use of that shoreline. She wished to “unlock” parcels 4, 6 and 8. Although she had done this to an extent by affording such premises access to the water over Lot 57, it was clear that, given the small shoreline abutting Lot 57, the above, for practical purposes, would be of little benefit to parcels 4, 6 and 8. To exercise true “riparian” rights — such as swimming, fishing and boating — a broader shoreline would be necessary.
Surely, the terminology employed, “reasonable riparian *202 rights” and “all riparian rights” was employed to specifically reserve a right to defendants greater than mere access. (Cf. Des Fosses v Rastelli, 283 App Div 1069, affd 308 NY 850; Knight v Ciarlone, 200 NYS2d 805.)
When Brown took his deed from Kreissle (Exhibit E), he struck therefrom the words “right of way to the waterfront” from the clause granting defendants “reasonable riparian rights”. Such deletion indicates to the court that Brown knew that the “riparian” clause affected his property interest. He knew he was getting less than all of which Kreissle was possessed. While he agreed that defendants’ predecessor in interest would have “riparian rights”, that is, waterfront use, he did not agree that the “right of way” to same would be over his property. Access to his waterfront could be had over Lot 57. In fact, such access was set forth in the preceeding line. In this regard, it is interesting to note that, in practice, as the community grew close, Brown, in actuality permitted such “right of way” over his land. This was a consensual arrangement, and, as the court has found, did not and could not develop into an easement.
That it was the intention of the parties to the deed that “riparian rights” was to mean to grant to the owners of 4, 6 and 8 to use the shoreline of 2’s property, is born out by the evidence as to the “practical construction” given to such terms by the parties. The evidence was clear and undisputed that all the residents of Cedar Lane considered the shoreline, and subsequently the bulkhead, to be subject to a community use. They all used it for “riparian purposes” freely and without permission. They each contributed 25% of the cost of building the bulkhead and walkway. They assisted, until plaintiff’s arrival, in maintaining the bulkhead and walkway.
While it may initially have been the intent of Mrs. Kreissle to grant 4, 6 and 8 riparian rights only to the “bank area”, the construction of the bulkhead by all four owners on the bank was evidence that their rights were extended to such bulkhead.
The court notes that plaintiff’s predecessor in interest, Robert Brown, unilaterally extended the bulkhead onto the waterfront abutting Lot 57. Surely, he knew at the time, *203 as plaintiff concedes herein, that defendants had access to the water over Lot 57. Is not his extention of the bulkhead to such area an indication of the “communal” nature of the use allowed, and Mr. Brown’s belief as to the same?
That the waterfront property has now substantially increased in value, or that boating as a recreational sport has expanded, or indeed, that recreational boats are now larger, does not change the necessary meaning which must be accorded to the terms “riparian rights” in the subject deeds.
Therefore, the court finds and declares that the owners of 2, 4, 6 and 8 Cedar Lane are each entitled to a 25 % area use of the bulkhead and walkway — with each owner bearing the cost of 25% of maintenance of the said area.
As plaintiff’s counsel notes, this is a community dispute. Enforcement of the terms of the judgment — including the fair allocation of water space, may be difficult. To assist in resolving any difficulties which may be presented, the court directs that all parties and counsel appear for a hearing before me on September 15, 1980 at 9:00 A.M. at Trial Term, Part II, as to the manner in which this judgment shall be implemented.