*474 OPINION OF THE COURT
John B. Nesbitt, J.
This case presents two novel issues regarding real estate taxation of commercial waterfront property. Specifically, are the riparian rights attached to such property as augmented by a submerged land license that authorizes offshore marina and dockage operations taxable under any circumstances? If so, are they taxable under the circumstances of this case where such rights were assigned by the upland owners to a corporate entity and the dockage is not permanently affixed to either the upland or any submerged lands?
I. Background
What prompts these inquires is the manner in which the Town of Huron has valued the petitioners’ property for purposes of the annual tax levies by the Town, county, and local school district upon real property within their respective jurisdictions. Of course, a municipality’s ability to generate revenue through this type of taxation must be found in and comply with state enabling authority (see Castle Oil Corp. v City of New York, 89 NY2d 334, 338-339 [1996]). Under the Real Property Tax Law, this tax takes the form of an annual monetary assessment against each unit of real property as deemed a “parcel,” a tax determined by a dollar rate applied to each thousand dollars of the parcel’s value as established for such purposes, unless eliminated or diminished by one or more statutory exemptions. (See generally RPTL art 5.)
Generally, under RPTL 305 (2), unless a uniform system of fractional property values is in place, a property’s value for purposes of real property taxation is its “full value.” (See 98 NY Jur 2d, Taxation and Assessment § 303.) This term derives from article XVI, § 2 of the State Constitution requiring that “[assessments shall in no case exceed full value” and is repeated in RPTL 701 (4) (a) defining “excessive” as “an entry on an assessment role of the assessed valuation of real property which exceeds the full value of real property.” By settled judicial construction, the term “value” means “market value” (see Foss v City of Rochester, 65 NY2d 247, 253 [1985]). Market value is the selling price upon which a reasonably informed buyer and seller would agree, in an open market setting, neither of whom is acting under any constraint or compulsion regarding the transaction (see Matter of Onondaga County Water Dist. v Board of Assessors of Town of Volney, 45 AD2d 258, 261 [4th Dept 1974]). The “best evi *475 dence” of such value is a recent sale of a property under those very conditions, failing which the courts have traditionally used one of three methods: comparable sales, capitalization of income, or reproduction cost less depreciation (see Matter of Allied Corp. v Town of Camillus, 80 NY2d 351, 356 [1992]). Eschewing categorical rules of market valuation, the courts are guided by its purpose in the taxation context “to arrive at a fair and realistic value of the property involved so that all property owners contribute equitably to the public fisc” (id.).
This simpliciter stages the issues raised at this juncture of the tax certiorari brought by petitioners. Before one can intelligently discuss market value and the appropriate methodologies to establish that value in a particular case, one must understand the object of the valuation. Petitioners claim that respondents have failed in this regard, resulting in an excessive valuation.
The facts upon which petitioners make this claim are straightforward and largely undisputed. The parcel at issue designated by respondents as tax account parcel No. 72117-00-890891 consists of approximately five acres of land known as 6483 Catchpole Road located in the Town of Huron, Wayne County. This parcel was conveyed to petitioners by deeds dated September 18, 1990, and recorded September 20, 1990, in the Wayne County Clerk’s Office at liber 851 at pages 818 and 820.
The parcel adjoins Great Sodus Bay and benefits from substantial waterfront. The petitioners developed the parcel commercially to where it now hosts a restaurant named Cutter’s Restaurant and a marina named Oak Park Marina. The restaurant and marina are separate operating entities, the latter by a corporation known as Oak Park Marina, Inc. (the corporation), also owned by petitioners. The marina operations use substantial upland improvements on the parcel, including buildings devoted to boat maintenance, repair, storage, and launching, as well as facilities for retail sales of fuel and boating accessories. The marina operations also include a dockage facility extending into Sodus Bay. This dockage facility consists of four main piers extending from the shoreline, the most southerly two being 420 feet long and the northerly two being 300 feet long. The piers are 100 feet distant from each other at the shoreline and as extended into the bay. Affixed to the end of each of these main piers are perpendicular pier extensions that form a “T” configuration. Three of the pier extensions creating the top of the “T” are 90 feet long, and the fourth attached to *476 one of the 420-foot main piers is 390 feet long. Extended laterally from all sides of the four “T” piers are approximately 125 docks, 30 or 40 feet in separate length, creating individual boat slips on each side. The total general effect is to create a dockage facility encompassing a square of water area 420 feet by 420 feet with a berthing capacity for approximately 250 boats.
The piers and docks are supported by flotation material incorporated into the construction, secured in location by apparatus anchored in the bay. The piers and docks are installed and removed on a seasonable basis to allow for the freezing of Sodus Bay during the winter and the' consequent damage that would be caused if the dockage was left to the mercy of the expanding, shifting, and heaving ice. The docks are attached to the shore at a breakwall from which electrical service extends for convenience of the boaters. When installed, the dockage is used primarily for seasonal slip rentals with some space left available for transient boaters.
II. Nature of Property Interest Being Assessed
The dockage facility has not gone unnoticed by the town assessors. In 1998, the assessors undertook a comprehensive reassessment of petitioners’ parcel. With the aid of recommended assessment methodology and computations provided by the New York State Office of Real Property Services, the Town arrived at a total assessment by first establishing the market value of the dockage facility to be the equal of the ostensible number of rental slips (250) times the market value of $3,300 per slip, for a total of $825,000. The Town claims that the market value per slip was extrapolated from reported statewide and regional marina sales data, substantially discounted in petitioners’ favor and much less than an income approach would warrant in this case, a value of $1,477,700 using the estimated figures and methodology employed by the State in its field valuation of the marina. The “extremely conservative” valuation of $825,000 was assigned as the land value of the four acres of the five-acre parcel that were devoted to commercial use and to which the docks are attached. The remaining one acre of nonwaterfront land improved by a private residence was assigned a separate value of $93,750.[1] To these values were added the upland improvements made upon the commercial part of the *477 parcel, being a restaurant at $473,300, a ship’s store at $37,000, and a swimming pool at $25,000, for a total aggregate value of $1,454,050. Since the 1998 reassessment, the only valuation change has been an additional $4,300 reflecting an improvement to the ship’s store made in 2000, raising the aggregate parcel valuation to $1,458,350 as reflected on the 2003 tax roll.
Petitioners instituted this tax certiorari proceeding contesting the parcel’s assessed valuation as appearing on the 2004 tax roll on several grounds, principally consisting of claims of illegal and erroneous valuation, and one of overvaluation, all of which relate to inclusion of the docks into total aggregate valuation. Petitioners have moved for certain declaratory relief at this early stage of the proceedings prior to discovery and appraisal exchange. At the outset, petitioners claim that the dockage does not constitute assessable property; as such, the Town erred as a matter of law in valuating the dockage and assigning that value as the commercial upland value. This claim has novel aspects to it not explored in reported decisional law.
Analysis must start, of course, with the statutory directive regarding what is or is not assessable property. RPTL 300 states that “[a] 11 real property within the state shall be subject to real property taxation . . . unless exempt therefrom by law.” RPTL 102 (12) (a) and (b) in relevant part define “real property” to mean the “land itself,” together with “[b]uildings and other articles and structures, substructures and superstructures erected upon, under[,] or above the land, or affixed thereto, including bridges and wharves and piers.” In determining what fits within this statutory definition of real property, courts are guided by “[t]he concepts and refinements which have developed in the classifications of types of property at common law” (Matter of Consolidated Edison Co. of N.Y. v City of New York, 44 NY2d 536, 541 [1978]).
At common law, what gives the concept of real property substance, and creates value, are the incidents of ownership collected under the familiar “bundle of rights” metaphor. The most important of these rights is that of possession and use. As stated by Blackstone:
“Land hath also, in its legal signification, an indefinite extent, upwards as well as downwards. Cujus est solum, ejus est usque ad coelum, is the maxim of *478 the law, upwards; therefore no man may erect any building, or the like, to overhang another’s land: and downwards, whatever is in a direct line, between the surface of any land, and the centre of the earth, belongs to the owner of the surface ... So that the word ‘land’ includes not only the face of the earth, but everything under it, or over it” (2 Blackstone, Commentaries on the Laws of England, at 18).
This concept of land was similarly understood by Chancellor Kent, who recognized in this country adoption of the English doctrine of corporeal hereditaments pertaining to certain rights incident to land ownership, including dominion not only over
“the ground or soil, but every thing which is attached to the earth, whether by the course of nature, as trees, herbage, and water, or by the hand of man, as houses and other buildings; and which has an indefinite extent, upwards as well as downwards, so as to include every thing terrestrial, under it or over it” (3 James Kent, Commentaries on American Law, at 321 [1st ed 1828]).
The three dimensional concept of real property created by upward and downward projections from lines demarking surface ownership challenges any attempt to include within its purview rights in space or objects outside those projections on, over, or under lands owned by another. This is the case here. The two deeds to the petitioners’ property describe its waterfront boundary either as the “high water line of Great Sodus Bay” or the “shoreline.” The deed descriptions respect the fact that beyond the shoreline, the State of New York holds title to the submerged lands (see Stevenson, Title of Land Under Water in New York, 23 Yale LJ 397 [1914]).[2] However, unique property rights arise as a result of ownership of land bordering watercourses, such as *479 rivers and streams, and bodies of water, such as ponds, lakes, and oceans (see Durham v Ingrassia, 105 Misc 2d 191, 199 [Sup Ct, Nassau County 1980]). These are riparian rights, some of which are incorporeal hereditaments to the extent they give the upland owner the right to use the bordering watercourse or body of water. Under common-law classification, these types of riparian rights are usufructuary, meaning that the right is one of certain use, not ownership, of the waters (see Rasch, 1 New York Law and Practice of Real Property § 673 [1st ed]). Nevertheless, under the Real Property Tax Law, riparian rights enhance the value of the land to which they are appurtenant and thus are to be included in the property’s assessment (see Matter of City of New York v Schwartz, 36 AD2d 402, 403 [3d Dept 1971], lv denied 29 NY2d 482 [1971]).
The court takes judicial notice of the fact that Sodus Bay is a body of navigable water. It is well settled that an upland owner has the riparian right of free ingress to and egress from abutting navigable water, including the right to install dockage for such purpose (see Matter of Haher’s Sodus Point Bait Shop v Wigle, 139 AD2d 950, 951 [4th Dept 1988], lv denied 73 NY2d 701 [1988]). There are no hard and fast rules to determine the lawful extent of such rights; rather, the courts work on a case-by-case basis to find what is a reasonable, safe, and convenient accommodation of the upland owner’s riparian interests and those of the general public (see Town of Hempstead v Oceanside Yacht Harbor, 38 AD2d 263, 264 [2d Dept 1972], affd 32 NY2d 859 [1973]). In any event, the right to maintain dockage does not extend beyond the point of navigability (see Rogers v South Slope Holding Corp., 172 Misc 2d 33, 38-39 [Sup Ct, Yates County 1997], mod 255 AD2d 898 [4th Dept 1998]). Of course, the distance of the point of navigability from the shoreline will vary from case to case. Generally, in the past, the State Office of General Services, which administers leases of submerged lands owned by the State of New York, has used a rule of thumb that recognizes this riparian right as one that allows docks constructed not more than 40 feet from the shoreline or to a depth of not more than four feet at end of the dockage (record on appeal at 250-251; Matter of Haher’s Sodus Point Bait Shop v Wigle, 139 AD2d 950 [4th Dept 1988], lv denied 73 NY2d 701 *480 [1988]).[3] Beyond these points, one reaches navigable water to which no riparian entitlement exists.[4]
Of course, the dockage at issue in this case extending 420 feet into the waters of Sodus Bay goes well beyond the scope of petitioners’ common-law riparian rights. However, petitioners acquired the right to install and maintain the dockage under Public Lands Law § 75. This law permits the State Commissioner of General Services to grant rights to state-owned lands under navigable water to private individuals or entities subject to statutory limitations as well as restrictions the Commissioner may impose as appropriate in particular cases. As relevant to the instant case, the statutory limitations are significant. First, any grant must be consistent with the public interest in protecting and preserving the availability of navigable waters for public use and due regard for the legitimate interests of neighboring private property owners (see Public Lands Law § 75).[5] Second, a grant of such rights can only be made to the upland riparian owner (proprietor of the adjacent land) and no other, a limitation designed to recognize and protect the riparian right of access of navigable water, which exists independent of statute. (See Public Lands Law § 75 [7] [a]; People v Schermerhorn, *481 19 Barb 540 [Sup Ct, NY County 1855].) Third, the use authorized by such grant must be “water dependent,” entailing “an activity which can only be conducted on, in, over or adjacent to a water body because such activity requires direct access to that water body, and which involves, as an integral part of such activity, the use of the water” (see Public Lands Law § 75 [7] [b] [ii]).
Petitioners, acting through a wholly-owned corporation, applied to the Commissioner of General Services and were granted the right to install the dockage subject to this proceeding. That right was memorialized in a written submerged land license commencing November 2, 2002, and running for a 10-year term. The license requires payment of an annual fee and adherence to the dockage plan submitted. The license requires that the grantee be responsible for payment of any local real property taxes that may result from the license. The latter provision reflects the fact that, while the state-owned submerged lands are exempt from taxation, the property that may become attached to the land pursuant the license may constitute separate and taxable “real property” for purposes of local taxation.[6]
The theory of assessment used by the Town in this case was not predicated upon the docks constituting separate “real property” because of their use and manner of connection to the leased submerged lands owned by the State. Rather, as succinctly stated by the town attorney, the assessors valued the petitioners’ property “based on the riparian right to locate 250 slips at the property, whether on permanent or temporary docks.” The Town employs a generous concept of riparian entitlement to sustain this position, including not only rights granted under the common law, but also rights granted pursuant to statute to maintain dockage over submerged lands not subject to common-law riparian use.
As noted, riparian rights are regarded as a taxable part of the real property to which they attach and are properly considered *482 in valuating that property. Contrarily, leasehold interests in real property are considered the personal property of the lessee, and not subject to real property taxation if the underlying fee is exempt from taxation (see Matter of Fort Hamilton Manor v Boyland, 4 NY2d 192, 198 [1958]). The issue for decision here is whether, for real property tax purposes, the dockage facility may be valued as part of the petitioners’ real property under the umbrella of riparian right, or excluded because the value of the dockage represents the value of the license granted to petitioners’ corporation by the State, which is personal, not real, property. For essentially two reasons, the court finds that the dockage was properly considered by the Town in assessing petitioners’ property. First, the governing statute is controlling regarding what is or is not to be considered real property for purposes of local taxation (see Matter of Consolidated Edison Co. of N.Y. v City of New York, 44 NY2d 536, 541 [1978]). RPTL 102 defines “real property” to include wharfs and piers attached to land. Absent some limiting definition of wharf or pier, the dockage at issue here fits comfortably within the common usage of these terms (see generally McKinney’s Cons Laws of NY, Book 1, Statutes § 94; Navigation Law § 2 [20] [a wharf is “any structure built or maintained for the purpose of providing a berthing place for vessels”]; 109 NY Jur 2d, Wharves §§ 2-4). The statute does not exclude wharfs or piers that extend into waters beyond the upland owner’s riparian entitlement, either with or without the blessing of a state license. So too, the statute does not distinguish between seasonal or permanent wharfs or piers, or the manner in which they are attached to the upland or lands submerged thereunder.
Second, apart from the express statutory language, the court finds that the unique features of a submerged land license issued under Public Lands Law § 75 distinguishes the facts from the typical lease of state property where the leasehold is regarded as personal property and not taxable. In the case of a submerged land license to install dockage, the license enlarges and extends the upland owner’s riparian entitlements. As indicated earlier, the license can only be granted to an upland owner, consistent with the rights of the public and neighboring property owners, and then only for water dependent uses. The license and usage it authorizes is appurtenant to the upland and properly considered as part and parcel of that land for local tax purposes. Accordingly, the Town was authorized to value petitioners’ property based upon consideration of the dockage facility attached thereto.
*483 III. Manner of Assessment of Riparian Property
Petitioners further argue that even if an offshore dockage facility may in some circumstances be considered in valuating the upland parcel to which it is attached, this is not proper under the circumstances of this case, where a separate, albeit wholly-owned, corporation owns and operates the dockage by virtue of a lease agreement with the upland property owners and the dockage is the separate personalty of the corporation. Petitioners fuse two issues: first, is there a real property interest to be assessed, and, if so, how do you value it? Regarding the first issue, once nonexempt property is classified as real property for tax purposes, the real property tax attaches to the combined interests of all parties interested in the property (Matter of Fort Hamilton Manor v Boyland, 4 NY2d 192 [1958]). However, like a lien of mortgage, a lease is “chattel real” constituting the personal property of the lessee and is not a taxable interest (see Matter of D.P.C. Reconstruction Fin. Corp. v Assessor of Town of Johnsburg, 135 AD2d 224, 225-226 [3d Dept 1988]). The mortgage or lease does not change the character of the property mortgaged or leased from real to personal property, thus diminishing the taxable interests of the owners of the mortgaged or leased property. In other words, a mortgage or lease of property is irrelevant to the issue whether that property is taxable as real property. The fact that a portion of petitioners’ property is leased to a corporation does not affect a determination whether the property leased is taxable.[7]
The existence of mortgaged or leased interests in real property may be relevant to the second issue of valuation. The relevance would come where the capitalization of income method of valuation is appropriate, and income and expenses largely determine commercial property value. Petitioners argue, in essence, that the Town’s use of this method is one that impermissibly taxes the purported value of its dockage business and not the value of any real property to which it is appurtenant. Petitioners reinforce their argument by noting that the dockage is owned and operated by the corporation separate and apart from the real estate and is not a part thereof. This argu *484 ment is the same or very similar to that made in cases of “specialty,” a type of real property that produces income only in conjunction with a business conducted thereon (98 NY Jur 2d, Taxation and Assessment § 305). The font of New York law in this area is People ex rel. Hotel Paramount Corp. v Chambers (298 NY 372 [1949]), where the Court held in the case of a hotel lodging transients that a valuation of realty based upon the hotel’s income was improper where such values reflected the elements of management, goodwill, and personal property (fixtures and equipment), factors foreign to the value of the realty (see also Matter of Placid-Marcy Co. v Board of Assessors of Town of N. Elba, 29 AD2d 818 [3d Dept 1968]; Matter of Putnam Theatrical Corp. v Gingold, 16 AD2d 413, 417 [4th Dept 1962]). This kind of commercial property is distinguished from other types of commercial property, where the owner’s income is based upon rentals of space, not upon the income of businesses using the space rented. (98 NY Jur 2d, Taxation and Assessment § 311.)
The court finds that dockage facilities of the type adjacent to petitioners’ property are not specialties in the sense that their value cannot be determined by income capitalization or comparable sales methods of real property valuation. Without gainsaying the intangible economic value of the amenities and management of the marina’s operations in positioning the dockage facility in the competitive market, what is producing income is the rental of space, not unlike spaces in a parking lot or garage for motor vehicles. The actual, or imputed rentals if appropriate, may be the basis of a valuation of petitioners’ real property (see Matter of Myron Hunt/Shaker Loudon Assoc. v Board of Assessment Review for Town of Colonie, 6 AD3d 953 [3d Dept 2004]).
The docks themselves and associated apparatus, apart from the income derived therefrom, certainly have value as tangible property. From the record before the court, it does not appear that the Town has assessed their value as a tangible piece of the real estate, as it did the restaurant, swimming pool, and marina store. Whether the dockage as tangible property bears sufficient physical and functional connection to the real property to qualify as a taxable component of petitioners’ real property does not control, in the court’s analysis, whether the income capitalization value derived from the dockage may be attributed to the upland. Indeed, the court has found that the docks’ status as realty or personal does not control the taxable value coming *485 from the rental of riparian space, albeit made possible by docks enabling beneficial use by slip renters. In any event, the court has found that the dockage meets the statutory definition of wharf so as to constitute real property under RPTL 102 [12], regardless whether the dockage would otherwise meet the criteria as a taxable accession to the real property under decisional law (see Matter of Consolidated Edison Co. of N.Y. v City of New York, 44 NY2d 536 [1978] [four barges with operating power generating turbines permanently moored at utility pier deemed taxable]; South Seas Yacht Club v Board of Assessors & Bd. of Assessment Review of County of Nassau, 136 AD2d 537 [2d Dept 1988] [boats and barges docked in marina lacking sufficient characteristics of permanent housing deemed not taxable]; Matter of Capri Marina & Pool Club v Board of Assessors of County of Nassau, 84 Misc 2d 1096 [Sup Ct, Nassau County 1976] [barge moored to bulkhead and used as restaurant deemed taxable]). Further, even were the issue controlling, the pattern of annual seasonal use of the dockage, the fixed attachment of the docks to the land when in use, and the lack of any other purpose of the docks except to enable commercial use of the riparian waters, all militate in a finding that the dockage as tangible property to be taxable under the Real Property Tax Law (see Matter of Maines v Board of Assessors of Town of Lafayette, 125 AD2d 951 [4th Dept 1986] [greenhouses periodically relocated on real property but never removed therefrom deemed taxable improvements]).
The remaining arguments of the parties relating to the validity of the data employed by the Town in reaching the challenged assessment upon petitioners’ property involve issues to be decided at trial after completion of discovery and exchange of appraisal reports.
Accordingly, petitioners’ motion for declaratory relief is denied on the merits to the extent it seeks judgment declaring that the dockage facility appurtenant to petitioners’ land cannot be considered in valuating that land for real property tax purposes. The remaining grounds for petitioners’ motion are denied without prejudice and may be renewed at the time of trial. The cross motion of the respondents for the demanded discovery is granted.

. This one acre with single-family residence had for several years prior to 1998 been given a separate tax subaccount at the request of the petitioners so they could receive a separate tax bill for what was their parents’ home at the *477 time, which billing arrangement continues. The residential structure is valued at $75,000, and the land at $18,750 (using $25,000 per acre for the first half acre and $12,500 per acre for the second half acre).

. “It has often been decided by the Supreme Court of the United States and by the New York Court of Appeals that in this country the fee title of lands under navigable waters up to the high water mark is vested in the commonwealth or state in which the property is situated, or in its grantees. These decisions are based upon the theory that the state or commonwealth is the logical and legal successor in this country of the sovereign or supreme power of Great Britain, which, before the Revolution, resided in the Crown and Parliament, and held, in the name of the King, the title to all public lands, including lands under water.” (Id., citing Illinois Central R. Co. v Illinois, 146 US 387 [1892]; Gibson v United States, 166 US 269 [1897]; Cummings v Chicago, 188 US 410 [1903]; North Shore Boom & Driving Co. v Nicomen Boom Co., 212 US 406 [1909]; People v Tibbetts, 19 NY 523 [1859]; People ex rel. Howell v *479 Jessup, 160 NY 249 [1899]; see generally 7 Warren’s Weed, New York Real Property, Land Under Water § 77.03 [2] [5th ed].)

. But see Board of Trustees of Town of Huntington v W. Wilton Wood, Inc., 97 AD2d 781, 783 (2d Dept 1983) (“Commercial operation of a marina does not constitute an unreasonable use of riparian rights as a matter of law”).

. Public Lands Law § 3 (1) charges the State Commissioner of General Services with the overall care and superintendence of all state lands unless such superintendence is specifically vested in another state agency. Public Lands Law § 8 reposes within the Commissioner the right and obligation to institute proceedings to remedy trespasses upon state lands. Public Lands Law § 75 (7) (b) states in pertinent part:
“No wharf, dock, pier, jetty, platform, breakwater, mooring or other structure shall be constructed, erected, anchored, suspended, placed or substantially replaced, altered, modified, enlarged, or expanded in, on or above state-owned lands underwater, nor shall any fill be placed on such lands underwater, unless a lease, easement, permit, or other interest is obtained from the commissioner, which authorizes the use and occupancy of those state-owned lands underwater to be affected by such act or acts.”

. This is a manifestation of what is known as the public trust doctrine. As stated in 7 Warren’s Weed, New York Real Property, Land Under Water § 77.10 (5th ed):
“Under the public trust doctrine the State holds lands under navigable waters and the foreshore in its sovereign capacity as trustee for the beneficial use and enjoyment of the public. The doctrine grows out of the common law concept of the jus publicum, the public right of navigation and fishery.”

. State-owned real property is exempt from local taxation pursuant to RPTL 404 (1). Property exempt from local taxation under RPTL 404 (1) does not lose its exempt status when it is leased to nongovernmental individuals or entities engaged in private enterprise (see 98 NY Jur 2d, Taxation and Assessment § 120). However, property owned by such lessee attached to such state-owned land is regarded as separate real property and taxable as such if the property falls within the statutory definition of “real property” set forth in RPTL 102 (12), which includes buildings, structures, and other articles, erected upon, above, or under the land, or affixed thereto (98 NY Jur 2d, Taxation and Assessment § 97; see Matter of Fort Hamilton Manor v Boyland, 4 NY2d 192, 198 [1958]).

. Contrast Matter of City of New York v Schwartz, 36 AD2d 402 (3d Dept 1971), lv denied 29 NY2d 482 (1971) (riparian rights severed from the land to which they were appurtenant and which do not become appurtenant to other lands are not real property within the meaning of Real Property Tax Law § 102 [12]); see also Matter of Niagara Mohawk Power Corp. v Cutler, 109 AD2d 403 (3d Dept 1985) (reaffirming Schwartz’s requirement that severance must be accompanied by appurtenance to other lands).